UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHARLES R. SMITH,

            Petitioner,

    v.

FRED FOULK,

            Respondent.

No.   2:13-cv-2387 KJM KJN P

FINDINGS AND RECOMMENDATIONS

I.     Introduction

      Petitioner is a state prisoner, proceeding pro se, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2009 conviction for carjacking, forcible oral copulation, and attempted robbery. Pursuant to pages numbered by petitioner as 5 and 6, the undersigned construes the petition as raising three grounds for relief: (1) the court erred in failing to strike DNA evidence; (2) the presentation of false or misleading evidence; and (3) insufficient evidence of attempted robbery.[1] (ECF No. 1 at 5, 6 & 8.)

---

[1] As explained in the court's April 2, 2015 order:

> Petitioner also included a separate page which he numbered 2 or 3; the undersigned cannot discern whether petitioner intended to change the number 2 into a 3, or change the number 3 into a 2. (ECF No. 1 at 2.) In any event, this page lists five separate claims, two of which are not set forth as grounds with supporting facts in the petition. (Id.) Because it is unclear what portion of the petition

1

1    Presently before the court is respondent's motion to dismiss the pending habeas petition as

2  barred by the one-year statute of limitations.  Petitioner filed an opposition[2] and respondent filed

3  a reply.  For the reasons set forth below, the undersigned recommends that respondent's motion to

4  dismiss be granted.

5      II.        Statutory Tolling

6    Petitioner does not dispute that the statute of limitations expired before the instant petition

7  was filed.  However, to assist the court in evaluating petitioner's claim that he is entitled to

8  equitable tolling, the court first addresses the issue of statutory tolling.

9    The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which became

10  law on April 24, 1996, imposed for the first time a statute of limitations on petitions for a writ of

11  habeas corpus filed by state prisoners.  This statute of limitations provides that:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody, pursuant to the judgment of a State court.  The limitation period shall run from the latest of –
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

23  28 U.S.C. § 2244 (d)(1).

---

> this information was meant to address, and petitioner failed to include supporting facts for the additional claims, such claims are not considered as raised in the instant petition.

(ECF No. 16 at 1.)

[2] Petitioner filed an opposition, ECF No. 26, and a supplemental opposition, ECF No. 29.  The supplemental opposition appears to be an exact copy of the initial opposition.  Accordingly, the court disregards the supplemental opposition and refers only to the initial opposition, ECF No. 26.

1       The relevant chronology of this case is as follows:

2         1.  In 2009, petitioner was convicted of carjacking, forcible oral copulation, kidnapping,

3             and attempted robbery.  (Respondent's Lodged Document ("LD") 1.)  Petitioner was

4             sentenced to 20 years plus 100 years to life in state prison.  (LD 1, 2.)

5         2.  Petitioner appealed, and on September 29, 2011, the California Court of Appeal, Third

6             Appellate District, reversed the convictions for the two counts of kidnapping, but

7             otherwise affirmed the judgment.[3]  (LD 2.)

8         3.  Petitioner filed a petition for review in the California Supreme Court.  (LD 3.)  The

9             California Supreme Court denied the petition on December 21, 2011.  (LD 4.)

10         4.  Petitioner filed no post-conviction collateral challenges in state court.

11         5.  The instant action was constructively filed on September 13, 2013.[4]  (ECF No. 1.)

12       The statute of limitations begins to run when petitioner's criminal judgment becomes

13 final.  The California Supreme Court denied the petition for review on December 21, 2011.  (LD

14 4.)  Petitioner's conviction became final ninety days later, on March 20, 2012, when the time for

15 seeking certiorari with the United States Supreme Court expired.  See Bowen v. Roe, 188 F.3d

---

16 [3] The Court of Appeal also struck the crime prevention fine.  (LD 2.)

17
18 [4] Because plaintiff is proceeding pro se, he is afforded the benefit of the prison mailbox rule.  See
Houston v. Lack, 487 U.S. 266, 276 (1988).  Under the prison mailbox rule, the date plaintiff
signed the petition is considered his filing date absent evidence to the contrary.  See Jenkins v.
19 Johnson, 330 F.3d 1146, 1149 n.2 (9th Cir. 2003) (date petition is signed may be considered
earliest possible date an inmate could submit his petition to prison authorities for filing under the
20 mailbox rule).

21 The instant petition for habeas corpus was signed on September 13, 2013.  (ECF No. 1 at 10.)
22 Attached to the petition is a notice from the Sacramento County Superior Court dated October 28,
2013, informing petitioner that he sent his petition to the wrong court and should send it to the
23 United States District Court.  (Id. at 11.)  The petition was received by the Eastern District of
California on November 18, 2013.  (Id. at 1.)  Petitioner did not re-sign the petition and did not
24 include a certificate of service.

25 Respondent acknowledges that petitioner initially sent his petition to the wrong court, but
26 nevertheless refers to September 13, 2013, as the date the petition was constructively filed.  (See
ECF No. 20 at 2.)  As will become clear, the petition is untimely regardless of whether it was
27 filed on September 13, 2013, or November 18, 2013.  Because the approximately two-month
difference between these two dates does not ultimately affect the court's analysis, the court refers
28 to September 13, 2013, as the date the petition was constructively filed.

1    1157 (9th Cir. 1999).  The AEDPA statute of limitations period began to run the following day,

2    on March 21, 2012.  See Patterson v. Stewart, 251 F.3d 1243, 1246 (9th Cir. 2001) (the AEDPA

3    limitations period begins to run on the day after the triggering event pursuant to Fed. R. Civ. P.

4    6(a)).  Absent tolling, petitioner's last day to file his federal petition was on March 20, 2013.

5          Petitioner filed no state post-conviction collateral challenges to his conviction.  Therefore,

6    the statute of limitations period expired on March 20, 2013.  Petitioner filed the instant action on

7    September 13, 2013, almost six months after the limitations period expired.  Accordingly, this

8    action is time-barred unless petitioner can demonstrate that he is entitled to equitable tolling.

9          III.    Equitable Tolling

10          The one year statute of limitations for filing a habeas petition may be equitably tolled if

11   extraordinary circumstances beyond a prisoner's control prevent the prisoner from filing on time.

12   See Holland v. Florida, 560 U.S. 631, 645 (2010).  A petitioner seeking equitable tolling must

13   establish two elements:  "(1) that he has been pursuing his rights diligently, and (2) that some

14   extraordinary circumstance stood in his way."  Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005).

15          In his opposition to the pending motion, petitioner argues that he is entitled to equitable

16   tolling because of mental illness.  (ECF No. 26.)  Petitioner claims that he is severely mentally ill

17   and that his antipsychotic medications left him unable to comprehend his responsibilities or to

18   prepare a habeas petition on his own during the "crucial period of time."  (See id. at 4-7.)

19          Petitioner also claims that because of his mental illness, he relied on an assistant to help

20   him with his legal work.  (Id. at 4.)  Petitioner appears to assert that he is entitled to equitable

21   tolling because his assistant gave him erroneous advice regarding the need to file a federal habeas

22   petition.  (See id.)

23          A. Mental Illness

24          The Ninth Circuit has articulated a specific, two-part test for an equitable tolling claim

25   based on a petitioner's mental impairment:

26              (1) *First,* a petitioner must show his mental impairment was an
                "extraordinary circumstance" beyond his control by demonstrating
27              the impairment was so severe that either

28              (a) petitioner was  unable  to  rationally  or  factually  to  personally

1  understand the need to timely file, or

2  (b) petitioner's mental state rendered him unable personally to
   prepare a habeas petition and effectuate its filing.

3
4  (2) *Second,* the petitioner must show diligence in pursuing the
   claims to the extent he could understand them, but that the mental
   impairment made it impossible to meet the filing deadline under the
5  totality of the circumstances, including reasonably available access
   to assistance.

6

7  Bills v. Clark, 628 F.3d 1092, 1099–1100 (9th Cir. 2010) (citations omitted) (italics in original);

8  see also Orthel v. Yates, 795 F.3d 935, 938 (9th Cir. 2015) ("A petitioner seeking equitable

9  tolling on the grounds of mental incompetence must show extraordinary circumstances, such as

10  an inability to rationally or factually personally understand the need to timely file, or a mental

11  state rendering an inability personally to prepare a habeas petition and effectuate its filing.").

12  Bills provides guidance for applying its two-part test:

13  [T]o evaluate whether a petitioner is entitled to equitable tolling, the
    district court must: (1) find the petitioner has made a non-frivolous
14  showing that he had a severe mental impairment during the filing
    period that would entitle him to an evidentiary hearing; (2)
15  determine, after considering the record, whether the petitioner
    satisfied his burden that he was in fact mentally impaired; (3)
16  determine whether the petitioner's mental impairment made it
    impossible to timely file on his own; and (4) consider whether the
17  circumstances demonstrate the petitioner was otherwise diligent in
    attempting to comply with the filing requirements.
18

19  Bills, supra, 628 F.3d at 1100–01.

20  A petitioner alleging a severe mental impairment during the filing period is not entitled to

21  an evidentiary hearing unless he or she makes "a good faith allegation that would, if true, entitle

22  him to equitable tolling." Laws v. Lamarque, 351 F.3d 919, 921 (9th Cir. 2003) (remanding for

23  consideration of whether the petitioner's delayed filing was "attributable to psychiatric

24  medication which deprived Petitioner of any kind of consciousness" where the petitioner had

25  demonstrated "evidence of serious mental illness" by attaching prison psychiatric and medical

26  records); see Bills, supra, 628 F.3d at 1099–1100 (remanding where the petitioner was in the

27  lowest percentile for verbal IQ, verbal comprehension and working memory, and, according to

28  clinical psychologists, was incapable of inferential thinking necessary to complete a federal

1   habeas form); see also Orthel, supra, 795 at 939-40 ("Where the record is amply developed, and

2   where it indicates that the petitioner's mental incompetence was not so severe as to cause the

3   untimely filing of his habeas petition, a district court is not obligated to hold evidentiary hearings

4   to further develop the factual record, notwithstanding a petitioner's allegations of mental

5   incompetence.") (quoting Roberts v. Marshall, 627 F.3d 768, 773 (9th Cir. 2010).)

6         Petitioner alleges that he has been diagnosed with paranoid schizophrenia, bipolar

7   disorder, and depressive order and that he takes "heavy" antipsychotic medications on a daily

8   basis, which leave him drowsy, incoherent, and unable to remember his responsibilities on his

9   own.  (ECF No. 26  at 2, 4-7.)  In support of his claim, petitioner provides a copy of his

10  "medication chart."  (Id. at 9-14.)  This document indicates that petitioner has been diagnosed

11  with a "mood disorder" and was prescribed psychotropic medications from 2009 to 2014.  (See

12  id. at 9-14.)

13        Respondent argues that petitioner is not entitled to equitable tolling based on mental

14  illness.  (ECF No. 31.)  Respondent contends that petitioner's medical records "do not reflect a

15  mental disorder of a severity that would prevent him from understanding the need to properly file

16  a timely federal petition and from enlisting the proper assistance."  (Id. at 3.)  Respondent

17  attaches a copy of petitioner's mental health records as Exhibit A to his reply.  (ECF No. 31-1).

18  The undersigned summarizes these records herein.

19        On January 26, 2012, petitioner was seen by Dr. Lewis, a staff psychologist.  (ECF No.

20  31-1 at 3.)  In the telemedicine report, Dr. Lewis wrote, "mood stable, current meds helpful."

21  (Id.)

22        On February 10, 2012, petitioner was seen by H. Parton, PhD.  (Id. at 4.)  Dr. Parton wrote

23  that petitioner reported he was "fine" and "denied any significant mental health concerns at this

24  time."  (Id.)  Dr. Parton's report indicates that petitioner has been diagnosed with schizoaffective

25  disorder.  (Id.)

26        On February 15, 2012, Dr. Parton signed a Mental Health Placement Chrono indicating

27  that petitioner met the criteria for placement in the Clinical Case Management (CCCMS)

28  program.  (Id. at 5.)  The chrono indicates that petitioner was prescribed psychotropic medications

1    and that his GAF score was 66.  (Id.)

2        On March 19, 2012, Dr. Lewis saw petitioner.  (Id. at 6.)  Dr. Lewis wrote that petitioner

3    stated that his medications were "helping a lot" and that the dosage was "good."  (Id.)  Dr. Lewis

4    noted that petitioner appeared "alert" and "oriented."  (Id.)

5        On April 16, 2012, petitioner was seen by A. Bowers, PhD.  (Id. at 7.)  Dr. Bowers wrote

6    that petitioner stated he was "doing well currently without any problems," and that petitioner

7    appeared "stable" and denied "acute distress."  (Id.)

8        On May 30, 2012, petitioner saw Dr. Bowers.  (Id. at 9.)  Dr. Bowers wrote that petitioner

9    indicated he was "doing well currently with no concerning mental health symptoms."  (Id.)  Dr.

10   Bowers reported that petitioner "stated that he was focused on issues related to his case and

11   hopefully getting judicial review."  Petitioner also "stated that he was good at asking for help

12   when he needed it."  (Id.)  Dr. Bowers noted that petitioner was "stable," "denie[d] acute

13   distress," and was "functioning well without breakthrough symptomology."  (Id.)  "[N]o

14   psychotic processes [were] observed."  (Id.)

15       On June 5, 2012, petitioner was seen by Dr. Lewis.  (Id. at 10.)  Petitioner was seen as an

16   outpatient.  (Id.)  Although it is not entirely clear, Dr. Lewis' notes appear to state that petitioner

17   requested a higher dosage of medication for his mood disorder.  (See id.)  The telemedicine form

18   indicates that petitioner's thought process was "organized," his judgment and insight were

19   "limited," and he appeared "alert" and "oriented."  (Id.)  The report contains the following

20   notation: "Axis I: 1. Depressive DSO NOS.  2. Hx PSD . . . Axis III: chronic headaches."  (Id.)

21       On July 26, 2012, petitioner was seen by Dr. Bowers.  (Id. at 12.)  Dr. Bowers wrote that

22   petitioner stated he was "doing well without any particular problems."  (Id.)  Dr. Bowers reported

23   that when he asked petitioner "what would be the only problem if petitioner had one," petitioner

24   stated, "If my family wasn't putting money on my books, but they are putting money on my

25   books."  (Id.)  Dr. Bowers wrote that petitioner stated his current medications were "working

26   well" and that he "continued to want to take them due to their usefulness."  (Id.)  Dr. Bowers

27   noted that petitioner was "stable[,] denie[d] all current distress[,] and [was] functioning well."

28   (Id.)

1    On September 25, 2012, petitioner saw Dr. Lewis.  (Id. at 13)  Petitioner was seen as an

2    outpatient.  (Id.)  The telemedicine report indicates that petitioner's medications were reordered,

3    but does not otherwise contain any updates.  (See id.)

4    On October 4, 2012, petitioner was seen by Dr. Lewis.  (Id. at 14.)  Petitioner was seen as

5    an outpatient.  (Id.)  A portion of Dr. Lewis' notes are illegible, but it appears that petitioner

6    requested an increased dosage of one of his medications.  (See id.)  The telemedicine form

7    indicates that petitioner's thought process was "organized," his judgment and insight were

8    "limited," and he appeared "alert" and "oriented."  (Id.)

9    Also on October 4, 2012, petitioner saw Dr. Bowers.  (Id. at 16.)  Dr. Bowers wrote that

10   petitioner was "doing well with no particular problems."  (Id.)  Dr. Bowers indicated that

11   petitioner stated he was pleased to have heard from his brother whom he was worried about.  (Id.)

12   Dr. Bowers also reported that petitioner "described medications as crucial to him in maintaining

13   stability."  (Id.)  Dr. Bowers observed that petitioner was "stable[,] denie[d] all current distress[,]

14   and [was] functioning well."  (Id.)

15   On November 13, 2012, petitioner saw Dr. Bowers.  (Id. at 16.)  Dr. Bowers wrote that

16   petitioner was "doing well and denied any current problems."  (Id.)  Dr. Bowers reported that

17   petitioner stated he was concerned about his family members but that contact with them had

18   improved.  (Id.)  Dr. Bowers noted that petitioner was "stable," "denie[d] acute distress," and was

19   "focused on positive programming."  (Id.)

20   On November 20, 2012, petitioner was seen by Dr. Lewis.  (Id. at 18.)  Petitioner was seen

21   as an outpatient.  (Id.)  The telemedicine form indicates that petitioner's thought process was

22   "organized," his judgment and insight were "limited," and he appeared "alert" and "oriented."

23   (Id.)

24   On December 17, 2012, petitioner saw Dr. Lewis.  (Id. at 19.)  Petitioner was seen as an

25   outpatient.  (Id.)  Dr. Lewis' notes read, "mood stable, current meds helpful."  (Id.)  The

26   telemedicine form indicates that petitioner's thought process was "organized," his judgment and

27   insight were "limited," and he appeared "alert" and "oriented."  (Id.)

28   ////

8

1    On January 29, 2013, petitioner was seen by Dr. Bowers.  (Id. at 21.)  Dr. Bowers wrote that

2    petitioner stated he was "doing well currently without any problems."  (Id.)  Dr. Bowers wrote

3    that he and petitioner discussed "programming issues" and "positive family interactions with

4    [petitioner's] sisters."  (Id.)  Dr. Bowers noted that petitioner was "currently stable" and was

5    "functioning well currently at CCCMS LOC without any noticeable breakthrough symptoms."

6    (Id.)

7           On February 11, 2013, petitioner was seen by Dr. Lewis.  (Id. at 22.)  The report indicates

8    that petitioner has a history of depression and unstable mood and that petitioner was taking

9    psychotropic medications including Venlafaxine and Trileptal.  (Id.)  Dr. Bowers wrote that

10   petitioner stated "his mood had remained stable" and that he wished to continue his current

11   medications, which he found "helpful."  (Id.)  Dr. Bowers wrote that petitioner stated, "I'm just

12   programming."  (Id.)  Dr. Bowers further noted, "no hopelessness, no psychotic symptoms mania

13   or hypomania."  (Id.)  "Medication side effects reported: none."  (Id.)  Dr. Bowers also noted that

14   petitioner reported compliance with his medications, and that Dr. Bowers had received no

15   referrals from staff regarding reports of petitioner's noncompliance with his medications.  (Id.)

16          On February 13, 2013, petitioner was seen by Dr. Lewis.  (Id. at 24.)  Petitioner was seen

17   as an outpatient.  (Id.)  A portion of Dr. Lewis' notes are illegible.  (See id.)  The box next to

18   "patient to be seen onsite for emergent issues pending evaluation in Telemedicine Psychiatry" is

19   checked.  (Id.)  The report indicates that petitioner's TABE score is 5.4  (Id.)

20          Also on February 13, 2013, Dr. Bowers completed a Mental Health Placement Chrono,

21   which indicates that petitioner met the criteria for placement in CCCMS.  (See id. at 25.)  The

22   chrono indicates that petitioner was prescribed psychotropic medication and that his GAF score

23   was 65.  (Id.)

24          On April 8, 2013, Dr. Lewis re-ordered petitioner's medications through May 12, 2013.

25   (Id. at 26.)  It appears that Dr. Lewis did not see petitioner that day because petitioner refused to

26   come to his appointment.  (See id.)

27          On May 21, 2013, petitioner saw Dr. Lewis. (Id. at 27.)  Dr. Lewis's report indicates that

28   petitioner was prescribed Venlafaxine for depression, Trileptal for "unstable mood," and

9

1   Remeron for depression and "SSRI-related insomnia/activation." (Id. at 28.) Dr. Lewis wrote:

2

3   > [Petitioner] states that his sleep and mood have improved with the
    > addition of Remeron. Denies significant anxiety or periods of
    > depressed mood. Enjoying educational program for GED. I/P
    > states he wishes to continue current medications as ordered and all
    > with PM dosing to decrease the risk of missing medication dosages.
    > No SI, no hopelessness, no psychotic symptoms, no symptoms
    > mania. Sleep: 8 hours/night. Appetite: good. Energy level: good.
    > Medication side effects reported: reports mild lightheadedness for
    > 3-4 days after starting Remeron, now resolved. I/P reports
    > compliance with medications. No referral from staff forwarded/no
    > notes present in eUHR re: medication non-compliance.

4

5

6

7

8   (Id. at 27.)

9       On June 11, 2013, petitioner was seen by Dr. Lewis. (Id. at 29.) Dr. Lewis wrote that

10  petitioner requested an increased dose of Remeron for mood and sleep. (Id.) Dr. Lewis noted

11  that petitioner reported "initial insomnia, mild to moderate, mood 'OK.'" (Id.) Dr. Lewis' report

12  states, "no SI, no hopelessness, no psychotic symptoms, no symptoms mania" and "med. side

13  effects reported: none." (Id.) Dr. Lewis noted that petitioner's mood was "mildly anxious" and

14  his thought process was "organized." (Id.)

15      On July 15, 2013, petitioner saw P. Wertzberger, PhD. (Id. at 31.) Dr. Wertzberger wrote

16  that he asked petitioner "what was new with him" and petitioner responded, "nothing much."

17  (Id.) Petitioner stated "that he has had the same cell mate for over two years, and that having a

18  compatible cell mate makes all the difference." (Id.) Dr. Wertzberger indicated that petitioner

19  denied any acute mental health concerns, and that petitioner appeared to be "psychiatrically

20  stable." (Id.)

21      On September 26, 2013, petitioner was seen by Dr. Alex Kushnier. (Id. at 32.) Dr.

22  Kushnier wrote that petitioner was "last seen on 8/1/13 when he reported Trileptal helpful for

23  mood, today reports requesting increased Remeron for sleep . . ."[5] (Id.) Dr. Kushnier reported

24  that petitioner stated his mood was "fine" and that he was "managing lockdown well." The report

25  further states, "Sleeps 5h/night, maintains interests, reads, exercises, good energy, no impairment

26  of memory or concentration . . ." (Id.) The report indicates that petitioner denied irritability or

27

28  ---
    [5] The medical records provided by respondent do not contain an entry for August 1, 2013.

1   anger, "denie[d] periods of expansive or irritable moods with decreased need for sleep," and

2   "denie[d] medication side effects." (Id.)  The report states, "AH but not troubling, no

3   VH/paranoia, no IOR.  Last experienced paranoia 3y ago when he was bothered by AH."[6]  (Id.)

4   In the psychological history section of the report, Dr. Kushnier explains,

5
6
7
8
9
> First psych meds in CDCR over stress and AH.  Reports AH since childhood worsening with age.  Described as multiple voices talking to him, negative (occasionally positive) thoughts, commands to hurt others, able to distract with music, experienced as both thoughts and voices (no OR), . . . thoughts clear voices unclear at times, improved with drug use.  Able to ignore AH currently although they never go away entirely, bothered him 3 years ago in CJ.  Depressive episodes experienced in context of psychotic [*illegible*].

10  (Id.)  The report notes that petitioner has never been "hospitalized psychiatrically" and that

11  petitioner's thought process appeared "linear and goal directed." (Id.)

12          On October 17, 2013, petitioner was seen by Dr. Wertzberger. (Id. at 34.)  Dr.

13  Wertzbeger wrote that petitioner "presented with clear, organized speech" and "denied any

14  specific emotional distress, other than reporting some mild insomnia, for which he requested an

15  increase in dosage of prescription medication."  Dr. Wertzberger noted that petitioner

16  "present[ed] as and report[ed] to be psychiatrically stable." (Id.)

17          On October 22, 2013, Dr. Kushnier completed a report indicating that petitioner "refused

18  [his] ducated appointment" that day. (Id. at 35.)

19          On November 17, 2013, petitioner was seen by Majumdar, N. D., MD. (Id. at 36.)  Dr.

20  Majumdar indicated that petitioner was informed that if a pattern of medication refusals was seen,

21  petitioner's treatment could be discontinued. (See id.)  Dr. Majumdar wrote that petitioner was

22  seen at his cell because he refused to come in for an office visit.  Petitioner reported that he had

23  been "alright."  When asked why he was in mental health treatment, petitioner stated that

24  depression was his chief complaint. (Id.)  Petitioner was reminded that he needed to come to

25  appointments to have his medications refilled, and petitioner stated he would do so. (Id.)  Dr.

26  Majumdar observed that petitioner was "awake, alert, and oriented to person, place, time, and

27
---
28  [6] It appears that "AH" stands for auditory hallucinations and "VH" stands for visual hallucinations.

1  situation" and that "his thought processes appeared were linear and goal directed."  (Id.)

2  Petitioner "had fair attention, concentration, comprehension, and memory" and "appeared to have

3  fair insight and judgment regarding his ongoing health care needs."[7]  (Id.)

4        After carefully considering the record, for the reasons stated herein, the undersigned finds

5  that petitioner is not entitled to equitable tolling based on mental illness.  Petitioner has not

6  demonstrated that he suffered from a mental impairment during the limitations period that

7  rendered him unable to rationally or factually understand the need to timely file his federal

8  petition or that rendered him unable to prepare his federal petition.

9        In the instant case, the relevant time period is between March 21, 2012, when the one-year

10 limitations period began, and September 13, 2013, the date the instant petition was constructively

11 filed.  See Laws, 351 F.3d at 923 ("Laws was adjudicated competent to stand trial in 1993,

12 notwithstanding evidence of serious mental illness.  But that determination has little bearing on

13 his competence *vel non* during the period, 1996-2000[,]" . . . "the years when his petitions should

14 have been filed.")  Petitioner claims that during the "crucial" time period, he was unable to

15 understand the need to timely file a petition or to prepare a petition on his own because of his

16 mental illness and the effects of his "heavy" antipsychotic medications.  (ECF No. 26.)

17       Petitioner's medical records indicate that petitioner was diagnosed with schizoaffective

18 disorder and/or depressive disorder.[8]  As of January 26, 2012,[9] petitioner was stable on

19 medication.  (ECF No. 31-1 at 3.)  Petitioner was thereafter seen every one to two months and

20 was consistently described by clinicians as alert and oriented, and his thought process organized.

21 Petitioner generally denied any side effects from his medications, other than "mild

22 lightheadedness" for three to four days in April 2013 when he started taking Remeron.  (Id. at

23

24 [7] Respondent provided petitioner's medical records through September 2015.  See ECF No. 31-1 at 37-66.  The court has reviewed petitioner's 2014 and 2015 medical records, but does not summarize them here.

25

26 [8] Petitioner's "Axis I" diagnosis is alternately listed as "schizoaffective disorder" and "depressive DSO."  (See ECF No. 31-1 at 4, 10.)

27

28 [9] The first medical record provided by respondent is dated January 26, 2012.  (ECF No. 31-1 at 3.)

12

1    27.)  While petitioner occasionally requested increased doses of medication for mood and

2    insomnia, it appears that petitioner was still able to function, since at these same appointments

3    petitioner was described as alert and oriented with an organized thought process.  (See id. at 10,

4    14, 27, 29.)  Thus, although petitioner was taking psychotropic medications during the relevant

5    time period, it does not appear that the medications left petitioner "incoherent" or in a "zombi[e]

6    state," as petitioner alleges.  (See ECF No. 26 at 5.)

7          In his opposition, petitioner provides a list of symptoms associated with paranoid

8    schizophrenia and bipolar disorder.  (See ECF No. 26 at 7.)  Petitioner asserts that during the time

9    the statute of limitations was running, he suffered from "severe" symptoms of mental illness,

10    which prevented him from "thinking clearly" and caused him to file an untimely petition.  (See id.

11    at 6.)  However, petitioner's medical records indicate that during the limitations period he was

12    generally "doing well with no concerning mental health symptoms."  (See ECF No. 31-1 at 4, 9,

13    12, 16, 21.)  For example, on May 30, 2012, February 11, 2013, and May 21, 2013, clinicians

14    specifically noted that no psychotic symptoms or processes were observed.  (Id. at 9, 22, 27.)

15    Petitioner's records from January 2012 through July 15, 2013, indicate that petitioner reported no

16    hallucinations, no delusions, and no commands to hurt himself or others.  (See ECF No. 31-1 at 3,

17    10, 14, 18, 19, 22, 27, 29, 31.)  While it appears that petitioner reported experiencing some

18    auditory hallucinations in September 2013, after the statute of limitations period had expired,

19    these hallucinations were described as "not bothersome" and petitioner's thought process at the

20    time was described as "linear and goal directed."  (Id. at 32.)

21          Petitioner's involvement in a number of activities during the limitations period further

22    suggests that petitioner was generally functioning well.  On May 30, 2012, two months after the

23    limitations period began, petitioner reported that he was "focused on issues related to his case and

24    hopefully getting judicial review."  (ECF No. 31-1 at 9.)  On November 12, 2012, January 29,

25    2012, and February 11, 2013, petitioner indicated that he was focused on programming.  (Id. at

26    16, 21, 22.)  On May 21, 2013, two months after the statute of limitations period expired,

27    petitioner reported to his clinician that he was "enjoying [the] educational program for GED."

28    (Id. at 27.)  The court also notes that during the relevant time period, petitioner was routinely seen

1     on an outpatient basis and was assigned to the CCCMS level of care, which "suggests that

2     petitioner was able to function despite his mental health problems."  Washington v. McDonald,

3     2010 WL 1999469, at *2 (C.D. Cal. Feb. 19, 2010) (citing Coleman v. Schwarzenegger, 922 F.

4     Supp. 2d 882, 903 n. 24 (E.D. Cal. 2009) (inmates designated to the CCCMS level of care "are

5     those 'whose symptoms are under control or in partial remission and can function in the general

6     prison population, administrative segregation, or segregated housing unit'").  In addition,

7     petitioner's GAF[10] score was recorded as 66 on February 15, 2012, and 65 on February 13, 2013,

8     which indicates that petitioner's symptoms were mild.  (ECF No. 31-1 at 5, 25.)  Thus, the

9     medical records do not demonstrate a medical incapacity so severe that it prevented petitioner

10    from understanding and acting on his rights.  Rather, petitioner was generally oriented, able to

11    communicate, and able to understand others.

12          While petitioner suffered from mental illness during the relevant period, petitioner failed

13    to demonstrate that his mental impairment was so severe that he was unable to either understand

14    the need to file or to personally prepare and file a habeas petition.  Accordingly, petitioner does

15    not meet the first prong of the Bills test.

16          Moreover, petitioner has not satisfied the second prong of Bills.  Under the second prong

17    of Bills, petitioner must establish that he diligently pursued his rights, but that his "mental

18

19    [10] "GAF" is an acronym for "Global Assessment of Functioning," a scale used by clinicians to
      assess an individual's overall level of functioning, including the "psychological, social, and
20    occupational functioning on a hypothetical continuum of mental health-illness."  Am. Psychiatric
      Ass'n, Diagnostic and Statistical Manual of Mental Disorders with Text Revisions 32 (4th
21    ed.2004).  A GAF of 61–70 indicates some mild symptoms (e.g., depressed mood and mild
      insomnia) or some difficulty in social, occupational, or school function (e.g, occasional truancy,
22    or theft within the household), but generally functioning pretty well, has some meaningful
      interpersonal relationships.  (Id.)  A GAF of 51–60 indicates moderate symptoms (e.g., flat affect
23    and circumstantial speech, occasional panic attacks) or moderate difficulty in social,
      occupational, or school function (e.g., few friends, conflicts with peers or co-workers.)  (Id.)  A
24    41–50 rating indicates serious symptoms such as suicidal ideation, severe obsessional rituals, or
      serious impairment in social, work, or school functioning.  A GAF of 31–40 indicates: "Some
25    impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or
      irrelevant) OR major impairment in several areas, such as work or school, family relations,
26    judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to
      work; child frequently beats up younger children, is defiant at home, and is failing at school.)"
27    (Id.)

28

1    impairment made it impossible to meet the filing deadline under the totality of the circumstances,

2    including reasonably available access to assistance."  Bills, 628 F.3d at 1100.

3         Here, petitioner's own explanation as to why his petition was untimely suggests that his

4    mental impairment was not the but-for cause of the delay in the filing of his federal petition.  See

5    Bills, 628 F.3d at 1100 ("The 'totality of the circumstances' inquiry in the second prong [of the

6    Bills test] "considers whether the petitioner's impairment was the but-for cause of any delay.").

7    In his opposition, petitioner explains that he had an assistant who was helping him with his legal

8    work.[11]  (ECF No. 26 at 4.)  According to petitioner, his assistant left him "with the impression

9    that everything [petitioner] needed to do concerning [his] writ of habeas corpus was done."  (See

10   id.)  As a result, petitioner thought that he was "waiting to go back to court."  (Id.)  Petitioner

11   explains that six months later, he learned from another inmate that he needed to file a federal

12   habeas petition.  (Id.)  Petitioner then filed the instant petition,[12] with the help of a different

13   assistant.  (See id.)

14        Petitioner's explanation suggests that petitioner's ignorance of the law, and not his mental

15   illness, was the but-for cause of his failure to file a timely petition.  While petitioner makes a

16   general allegation that his mental illness caused his untimely filing, petitioner's conclusory

17   allegations do not establish a causal connection between his mental impairments and his failure to

18   file a timely petition.  Because petitioner has failed to establish a causal link between his mental

19   illness and his delay in filing his federal habeas petition, equitable tolling is not warranted.  See

20   Gaston v. Palmer, 417 F.3d 1030, 1034-35 (9th Cir. 2005) (upholding a finding that equitable

21   tolling was inapplicable where petitioner failed to show a causal connection between physical and

22   mental disabilities and inability to timely file petition), modified on other grounds by, 447 F.3d

23   1165 (9th Cir.).  See also Jones v. Marshall, No. CV 09-0233 GHK (JTL), 2009 WL 2189892 at

24   *9 n. 13 (C.D. Cal. July 17, 2009) (rejecting claim for equitable tolling based on alleged mental

25   _____

     [11] Petitioner does not provide any details as to the identity of his assistant.

26

27   [12] Petitioner states that six months had passed by the time he learned that he needed to file a
     federal habeas petition.  (ECF No. 26 at 4.)  Because petitioner does not indicate when the six
     month period began, it is not clear how much time passed between the time petitioner learned of
28   the need to file a petition, and the time his petition was actually filed.

                                        15

1    illness because petitioner failed to establish that his mental condition was the "but for" cause of

2    his failure to timely file a federal habeas petition.).

3         Furthermore, petitioner has not established that he pursued his rights diligently. See Bills,

4    628 F. 3d at 1100 (petitioner "must diligently seek assistance and exploit whatever assistance is

5    reasonably available").  A petitioner may satisfy the diligence prong if "the petitioner's mental

6    impairment prevented him from locating assistance or communicating with or sufficiently

7    supervising any assistance actually found." Id.

8         Here, petitioner has alleged no facts showing assistance was not reasonably available or

9    that his alleged mental problems prevented him from locating or communicating with others for

10   assistance in order to file a timely petition.  Review of the medical records demonstrates that

11   petitioner was able to communicate clearly with medical professionals concerning his health

12   issues.  On May 30, 2012, petitioner even told his clinician that he was "good at asking for help

13   when he needed it."  (ECF No. 31-1 at 9.)  Moreover, once petitioner learned of the need to file a

14   federal petition, he was able to secure assistance and file the instant petition, which suggests that

15   assistance was reasonably available to petitioner and that he knew how to ask for it. See Bills,

16   628 F. 3d at 1100 ("[A] petitioner's mental impairment might justify equitable tolling if it

17   interferes with the ability to understand the need for assistance, the ability to secure it, or the

18   ability to cooperate with or monitor assistance the petitioner does secure.").  Finally, for at least

19   part of the relevant time period, petitioner was "focused on issues relating to his case,"

20   programming, and working on his GED, which suggests that petitioner's mental illness did not

21   interfere with his ability to locate or understand the need for assistance.  Thus, petitioner has not

22   shown that he acted diligently.

23        For the reasons discussed above, the undersigned finds that petitioner is not entitled to

24   equitable tolling based on mental illness.[13]

25   ////

26

---

27   [13] Because the record is sufficiently developed for the undersigned to conclude that petitioner's
     mental illness was not so severe as to cause the untimely habeas petition, petitioner is not entitled
28   to an evidentiary hearing.

1

     B.  Reliance on Legal Assistant

2

     As discussed above, petitioner asserts he was being assisted by "someone" who left him

3

"with the impression that everything [petitioner] needed to do concerning [his] writ of habeas

4

corpus was done." (See ECF No. 24 at 4.) As a result, petitioner thought that he was "waiting to

5

go back to court" and did not learn until six months later that he needed to file a federal habeas

6

petition. (Id.) Respondent asserts that to the extent petitioner claims that "his inmate assistant

7

gave him erroneous advice which caused the untimely filing of his federal petition . . . , such

8

erroneous advice is insufficient to show entitlement to equitable tolling." (ECF No. 31 at 5.)

9

     Several courts have rejected claims of equitable tolling based on difficulties with writ

10

writers. In Marsh v. Soares, 223 F.3d 1217, 1220 (10th Cir. 2000), the Tenth Circuit Court of

11

Appeals rejected an inmate's claim that he was entitled to equitable tolling for the period of time

12

the writ writer was preparing the petition. The Court held that "the fact that an inmate law clerk

13

was drafting the state petition does not relieve Mr. Marsh from the personal responsibility of

14

complying with the law." In United States v. Cicero, 214 F.3d 199, 204 (D.C. Cir. 2000), the

15

movant had relied on a writ writer whose placement in segregation "separated [petitioner] and his

16

papers for some time before the expiration of the one year grace period until after the filing

17

deadline had passed." The court found this assertion an insufficient basis for equitable tolling,

18

because movant "entrusted [the writ-writer] with his legal documents at his peril." Id. at 205.

19

Finally, in Nguyen v. Yates, No. CV 09-4128-VAP (MAN), 2010 WL 2569246, at *10-11 (C.D.

20

Cal. Apr. 29, 2010), the court held that "any contention that petitioner received inadequate

21

assistance from other inmates in connection with his habeas efforts could not suffice to show an

22

extraordinary circumstance." Quoting Henderson v. Johnson, 1 F.Supp.2d 650, 655 (N.D. Tex.

23

1998), the court observed:

24

     [I]f this court were to approve the ground on which [the petitioner]
     relies, it would materially ease the high standard necessary to toll

25

     AEDPA's limitation period, thereby undermining Congress'
     expressed desire to accelerate the federal habeas process . . .

26

27

     Inmates who assist other prisoners with legal matters are not subject
     to the ethical and fiduciary obligations of lawyers. If their
     miscreant, inept or negligent conduct were deemed sufficient of

28

     itself to toll the AEDPA limitations period, the time-bar would be

17

1   rendered virtually meaningless.

2   Id.

3   Here, petitioner alleges at most that his assistant gave him incorrect information regarding

4   the need to file another habeas petition.  Petitioner does not allege that the writ writer withheld

5   petitioner's files or records or otherwise made it impossible for petitioner himself to file a timely

6   petition.  In this case, petitioner's bare allegation of negligence by his assistant cannot support

7   equitable tolling.

8       IV.     Conclusion

9   For the reasons discussed above, the undersigned finds that this action is barred by the

10  statute of limitations.

11  Accordingly, IT IS HEREBY RECOMMENDED that respondent's motion to dismiss

12  (ECF No. 20) be granted.

13  These findings and recommendations are submitted to the United States District Judge

14  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

15  after being served with these findings and recommendations, any party may file written

16  objections with the court and serve a copy on all parties.  Such a document should be captioned

17  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

18  he shall also address whether a certificate of appealability should issue and, if so, why and as to

19  which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

20  applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §

21  2253(c)(3).  Any response to the objections shall be served and filed within fourteen days after

22  service of the objections.  The parties are advised that failure to file objections within the

23  specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

24  F.2d 1153 (9th Cir. 1991).

25  Dated:  February 4, 2016

26

27  /smit2387.mtd.f&r

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

28

18